PEARSON, J.

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| DALE H. HENCEROTH, *et al.*, | ) |
| | ) CASE NO. 4:15CV2591 |
| Plaintiffs, | ) |
| | ) JUDGE BENITA Y. PEARSON |
| v. | ) |
| | ) |
| CHESAPEAKE EXPLORATION, L.L.C., | ) **MEMORANDUM OF OPINION** |
| | ) **AND ORDER** |
| Defendant. | ) [Resolving ECF Nos. 141, 146, and 177] |

Pending is Plaintiffs' Motion for Summary Judgment (ECF No. 141). Also pending is Defendant's Motion for Summary Judgment (ECF No. 146). The Court has been advised, having reviewed the record, the parties' briefs, and the applicable law. The Court has also considered the arguments of counsel offered during the oral argument held on September 13, 2019. For the reasons that follow, the Court agrees with Defendant's interpretation of how payment of oil and gas royalties are to be calculated and then paid to Plaintiffs. Therefore, there is no breach of contract. The Court grants Defendant's motion, and denies Plaintiffs' motion.

## I. Stipulated Facts

The stipulated facts[1] are as follows:

1. On March 23, 2017, the Court certified a class in this case of those royalty owners who had a producing oil and gas lease in which Anschutz Exploration Corporation was named as

---

[1] *See* Joint Stipulations of Fact (ECF No. 145). Plaintiffs also filed Plaintiffs' Statement of Undisputed Material Facts (ECF No. 143), that sets forth an additional 80 paragraphs.

(4:15CV2591)

the lessee, and the lease had been assigned or otherwise acquired by Defendant Chesapeake Exploration, L.L.C. (hereinafter "Defendant" or "CELLC"). Mem. of Op. Granting Pls.' Mot. for Class Cert., dated Mar. 23, 2018 (ECF No. 116).[2]

2. The Class Leases produce natural gas through approximately 411 unique Utica Shale wells (the "Wells"). *See, e.g.*, Third Expert Report of Kris Terry, December 19, 2018 (ECF No. 148-1) ¶¶ 1, 62.

3. The Class Leases authorize CELLC to enter the class members' land and to produce and sell any oil and natural gas found there, and set forth the obligations of the parties. *See, e.g.*, Wendt Living Trust Lease ¶ 1.

4. The royalty provisions in paragraph 5 of the base lease of the Class Leases are substantially the same, except for the royalty percentage owed. The language of the royalty provision contained in the Wendt Living Trust Lease is as follows:

> 5. **PAYMENTS TO LESSOR.** Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows: . . . (B) **ROYALTY:** To pay Lessor as Royalty, less all applicable truces, assessments, and adjustments on production from the Leasehold, as follows: 1. OIL: To deliver to the credit of Lessor, free of cost, a Royalty of the equal one-eighth part of all oil and any constituents thereof produced and marketed from the Leasehold. 2. GAS: To pay Lessor an amount equal to one-eighth of the net proceeds realized by Lessee from the sale of all gas and the constituents thereof produced and marketed from the Leasehold. Lessee may withhold Royalty payment until such time as the total withheld exceeds twenty-five dollars ($25.00).

*See Id.* ¶ 5.

---

[2] The United States Court of Appeals for the Sixth Circuit denied CELLC's Rule 23(f) Petition for Permission to Appeal Class Certification Order. *In re: Chesapeake Explorations, L.L.C.*, No. 18-0303 (6th Cir. July 20, 2018) (ECF No. 126).

(4:15CV2591)

     5. Approximately 90 of the Class Leases have an Addendum that modifies the royalty language in the base lease, which Plaintiffs described as a "market enhancement clause" and term the "Group 2" leases. Pls.' Reply Brief in Support of Motion for Class Cert., dated Oct. 13, 2017 (ECF No. 101), at 3.

     6. Approximately 7 of the Class Leases have different Addendum that modifies the royalty language in the base lease, which Plaintiffs term the Group 3 leases. Pls.' Reply Brief in Support of Motion for Class Cert. at 3-4.

     7. CELLC, Chesapeake Operating LLC ("COLLC") and Chesapeake Energy Marketing, L.L.C. ("CEMLLC") are subsidiaries of Chesapeake Energy, and affiliates of each other. *See, e.g.*, *id.*

     8. CELLC and CEMLLC are formed as separate limited liability companies and are separate entities. *See* Pls.' Objs. & Resps. to CELLC's Reqs. for Admis. Nos. 5 and 8, dated Nov. 12, 2018.

     9. CELLC is the operator and producer of the Wells. *See* Chris Sorrells Dep. 9:18-25, May 3, 2017 ("Sorrells Dep.") (ECF No. 85).

     10. COLLC is CELLC's operating affiliate, and it has entered into agreements with CELLC which relates to its interest in the Wells and under which COLLC employees provide services for CELLC. *See* CHK_HENCEROTH_00005123-27, ¶ 2 (authorizing COLLC to enter into contracts on behalf of CELLC with purchasers of oil and gas production, collect and receive payment for the sale of production, receive notices, approve expenditures, receive billings and pay expenses, and communicate with purchasers of production).

(4:15CV2591)

11. Plaintiffs pursued and were granted class certification on a single claim that CELLC calculated the royalties under the Class Lease using the incorrect price. Mem. of Op. Granting Pls.' Mot. for Class Cert. (ECF No. 116) at 3, 13-14; Class Cert. Hr'g Tr. (ECF No. 114) 13:7-17, Dec. 14, 2017.

12. The Leases provide that oil, condensate, gas, and natural gas liquids ("NGLs") may be produced and sold from the Wells. *See* Wendt Living Trust Lease ¶ 1.

13. The NGLs are part of the natural gas stream, and are separated from the natural gas after it is brought to the surface. *See* Second Am. Compl., dated Apr. 25, 2016 (ECF No. 18) ¶ 32.

14. At or near the Wells, CELLC transfers title to the oil, gas, and NGLs produced to CEMLLC. *See* Pls.' Objs. & Resps. to CELLC's Reqs. for Admis. No. 16 (admitting title is transferred to CEMLLC at or near the well).

15. The transaction confirmation produced with the NAESB gas sales contract states "Contract Price: 97% of the applicable CEMI weighted average sales prices (WASP) for each Delivery Point, minus Seller's proportionate share of any applicable fees incurred by CEMI in marketing such production, including, but not limited to, fees for compression, fuel and gas lost-and-unaccounted-for, dehydration, gathering, transportation, treating and processing." *See* CHK_HENCEROTH_00005082-97 at CHK_HENCEROTH_00005096; ECF No. 141-9 at PageID #: 10926).

(4:15CV2591)

16. Defendant produced in discovery an "Oil Purchase and Sale Contract" between COLLC and CEMLLC. Oil Purchase and Sale Contract, CHK_HENCEROTH_00005104-5122 ("the "Oil Contract").

17. The Oil Contract, produced at CHK_HENCEROTH_0005104-5122 states at the top of the first page "OIL PURCHASE AND SALE CONTRACT All States." *Id.* at CHK_HENCEROTH_0005104.

18. The Oil Contract has no provision stating that COLLC is contracting as an agent. *Id.*

19. The Oil Contract has a section titled "Purpose and Procedures" that provides: "Seller agrees to make available for purchase by Buyer all Oil owned or controlled by Seller in the Contract Areas" identified on Exhibit "A" attached hereto and made a part hereof. *Id.* at CHK_HENCEROTH_00005104.

20. The Oil Contract has a section titled "Quality and Delivery" that provides: Seller shall deliver all of Seller's owned and/or controlled crude oil and/or condensate production from leases as described on the attached Exhibit "A." *Id.*

21. The Oil Contract has a section titled "Price" that provides: Seller shall deliver all of Seller's owned and/or controlled crude oil and/or condensate production from leases as described on the attached Exhibit "A." *Id.* at CHK_HENCEROTH_00005105.

22. Effective December 1, 2010, the Oil Contract was amended as follows: The PRICE paragraph shall be deleted in its entirety and replaced with the following new paragraph: Buyer agrees to pay seller, for all Oil delivered by Seller to Buyer under the terms of this Contract, a Contract Price equal to 99% of the net oil resale price per barrel on all oil/condensate sales. The

5

(4:15CV2591)

Contract Price shall be reduced by Buyer's actual cost of any applicable fees incurred in marketing such production, including, but not limited to taxes, fees for gravity adjustment, transportation or treating. Except as herein amended, the above-referenced Contract shall remain in full force and effect with all terms and provisions thereof. Amendment at CHK_HENCEROTH_00005110.

23. The 2010 Amendment replaced the "PRICE" paragraph of the Oil Contract but did not amend the "PURPOSES AND PROCEDURES" section or the "QUANTITY AND DELIVERY" section.

24. CEMLLC transports the oil, gas, and NGLs from the wellhead and contracts with third-parties to provide post-production services. CEMLLC sells the oil, gas, and NGLs to third-party purchasers downstream. *See* CELLC's Objs. & Resps. to Pl. M. Henceroth's Interrog. No. 7, dated Jan. 5, 2017.

25. CEMLLC contracts with third-parties to provide post-production services for the oil, gas, and NGLs purchased at or near the wellhead. Sorrells Dep. ([ECF No. 85](#)) 50:3-53:1.

26. Post-production services include, among others, gathering, treating, processing, storing, and transporting to downstream delivery points. *See* Sorrells Dep. ([ECF No. 85](#)) 50:18-51:13.

27. CEMLLC, not CELLC, pays post production costs. Pls.' Objs. & Resps. to CELLC's Reqs. for Admis. No. 1.

28. The Class Leases require Respondents to pay royalties on the oil, gas, and NGLs produced from the leased premises. Lease of Marilyn Wendt ¶ 5.b.

6

(4:15CV2591)

29. CEMLLC pays COLLC for the oil, gas, and NGLs purchased at the wellhead. COLLC receives these payments on behalf of CELLC as part of the agency and management agreements it entered into with CELLC. *See* CHK_HENCEROTH_00005123-27, ¶ 2 (authorizing COLLC to receive payment on behalf of CELLC).

30. Mr. Johnson is no longer employed by CEMLLC or any other affiliate of Chesapeake Energy Corporation. Transcript of Deposition of James Johnson ("Johnson Dep.") at ([ECF No. 141-8](#)) 10:4-7.

31. Defendant produced no Base Contract bearing the number 95358.

32. Defendant produced in discovery an Excel Spreadsheet titled CHK EXPLORATION LLC Trial Balance ("Trial Balance"). CHK_HENCEROTH_00019897.

## II. Procedural History

The named Plaintiffs, Dale H. Henceroth and Marilyn S. Wendt, along with eight others brought suit against Defendant Chesapeake Exploration, L.L.C. ("CELLC") for breach of contract arising from CELLC's alleged underpayment of oil and gas royalties because Defendant paid the royalties on the wrong price. Second Amended Class Action Complaint ([ECF No. 18](#)).

## III. Standard of Review

Summary judgment is appropriately granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." [Fed. R. Civ. P. 56(a)](#); *see also [Johnson v. Karnes](#)*, 398 F.3d 868, 873 (6th Cir. 2005). The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the

(4:15CV2591)

burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial." *Guarino v. Brookfield Twp. Trustees.*, 980 F.2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of genuine dispute. An opposing party may not simply rely on its pleadings. Rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). The non-moving party must, to defeat the motion, "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino*, 980 F.2d at 403. In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

The United States Supreme Court, in deciding *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), stated that in order for a motion for summary judgment to be granted, there must be no genuine issue of material fact. *Id.* at 248. The existence of some mere factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007). A fact is "material" only if its resolution will affect the outcome of the lawsuit. In determining whether a factual issue is "genuine," the

(4:15CV2591)

court must decide whether the evidence is such that reasonable jurors could find that the non-moving party is entitled to a verdict. *Id.* Summary judgment "will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990). The existence of a mere scintilla of evidence in support of the non-moving party's position ordinarily will not be sufficient to defeat a motion for summary judgment. *Id.* This standard of review does not differ when reviewing cross-motions for summary judgment versus a motion filed by only one party. *United Food & Commercial Workers Union Local No. 17A v. Hudson Ins. Co.*, No. 5:11CV2495, 2012 WL 2343905, at *2 (N.D. Ohio June 20, 2012) (Pearson, J.).

## IV. Analysis

Plaintiff's motion presents three issues. First, whether the gas is marketed at the well to CEMLLC or only in the sale to third-party buyers in downstream markets. Second, whether CELLC "realizes" the wellhead price or the third-party price. Third, whether costs can be deducted from the price paid by the third-party buyers. The dispute is over when the oil and gas is "marketed" and what revenue is "realized" as those terms are used in section 5(B) of the Class Leases. Plaintiffs seek to receive royalty payments based upon the downstream sales price paid to CEMLLC without cost deduction. Plaintiffs argue that the royalties must be calculated on the gross proceeds paid by the third-party buyers, without cost deductions because the costs are incurred after title transfers. According to Plaintiffs, the only products "marketed" are the products marketed to the third-party buyers and the only revenues "paid" to CEMLLC is the real

9

cash paid by the third-party buyers. Plaintiffs contend that CELLC paid their royalties on the wrong price. This claim arises from the two-step manner in which CELLC markets and sells oil and gas that it produces in Ohio.

According to Plaintiffs, CELLC's Trial Balance (ECF No. 141-13)[3] confirms that CELLC receives the gross proceeds paid by the third-party buyers. Plaintiffs cite the deposition testimony of Megan Martin, designated by CELLC in this case as its Rule 30(b)(6) witness on the Trial Balance, that the gross revenue paid by the third-party buyers is "received" by Defendant, "distributed" to Defendant, and "recorded" to Defendant. Deposition of Megan Martin (ECF No. 141-14) at pp. 10, 14-15, 17-19, 25, 27-28, 42, 46, 75-76, 80-81. However, Martin also testified:

> Q. . . . [D]o you know whether Chesapeake Operating and Chesapeake Exploration are paid a netback price from Chesapeake Energy Marketing, LLC, for oil and gas sales in Ohio?
> A. Yes, I do.
> Q. And are they paid the netback price from Chesapeake Marketing?
> A. Yes.

ECF No. 141-14 at p. 62.

> Q. . . . Can you clarify which is the -- which is the case? Is this the gross amount paid by the third-party buyers to CEM, LLC, or is it the gross amount paid by the third-party buyers to CEM, LLC, with royalties deducted and with gathering and transportation deducted?
> MS. MORAN: Objection to form. Compound question. Confusing.
> A. Okay. So per revenue recognition guidance, which you report revenue and costs, you have to break it out. So the revenue items reported on Chesapeake Exploration for the revenue line items would be the -- the gross price but netted

---

[3] The trial balance is required under generally accepted accounting principles ("GAAP") because once Defendant knows what the components are, GAAP requires that both revenue and expenses be recorded at the same time, resulting in the netback price. *See* Deposition of Gary B. Goolsby (ECF No. 148-11) at p. 64; Expert Report of Gary B. Goolsby (ECF No. 148-11 at PageID #: 11989-12007) at ¶ 30.

(4:15CV2591)

> down to only show Chesapeake Exploration's net revenue interest. And then the costs, which are the gathering and transportation expenses -- these are the costs that are netted out of payment to COI and then paid to Chesapeake Exploration, and these would be for the netted interest of Chesapeake Exploration, LLC, as well.

[ECF No. 141-14](#) at p. 22-23.[4]

> Q. And can you explain to us why the netback price is broken out in this way on this Exhibit 1 rather than just showing up in one line entry exhibiting the netback price that Chesapeake Operating and then Chesapeake Exploration actually receives?
> A. Yes. So per [GAAP] and revenue recognition guidance, when you receive known components between revenue and any cost, you should appropriately record those either in a revenue line item for your SEC filings and expense item for SEC filings. And so the reason we break it out and record it into separate general ledger accounts, which are the numbers I've been referencing on Exhibit 1, the 510300, those are general ledger account numbers.
> \* \* \*
> Q. Okay. So it's a [GAAP] requirement?
> A. Yes.

[ECF No. 141-14](#) at p. 66-67.

> Q. If, in fact, Chesapeake Exploration is only paid the net, then those costs have nothing to do with Chesapeake's -- Exploration's income. In other words, I guess my question is, is there any [GAAP] requirement that requires an entity to report costs that are not incurred by them?
> MS. MORAN: Objection to form.
> A. So there's revenue recognition guidance. And it's about 600 pages long of requirements of how you need to report accounting -- an account for revenue with said partners in contracts. And so I guess we could get into the specifics of that, but we'd probably need to pull the guidance up. But basically just summarizing says, you know, if you know the components are there, you should and shall

---

[4] Ms. Martin similarly attests that "CEMLLC pays the proceeds for such sales, calculated according to this netback price (i.e., less the costs of post-production expenses), to COLLC, less the marketing fee that CEMLLC charges Chesapeake Exploration (but which is not passed onto royalty owners)." Affidavit of Meghan Martin ([ECF No. 148-9](#)) at PageID #: 11829, ¶ 6.

11

(4:15CV2591)

> recognize them in the accounting financial statements and those separate
> components.
>
> \* \* \*
>
> Q. (BY MR. SANDERS) And my question is dealing with why you have to
> include the -- the calculation of the net if the revenue of the company is the net.
> In other words, if they receive the net and that's their gross revenue, why are you
> showing costs incurred by some other entity? Do you see my question?
> MS. MORAN: Objection to form.
> A. Yes. It's just an accounting requirement that if the components are known,
> you should report them separately.
> Q. (BY MR. SANDERS) But if the components are known of the -- of the
> revenue that -- that the reporting company has received, you then have to show the
> components of the revenue that the reporting company has received. Correct?
> MS. MORAN: Objection to form.
> A. Yeah. So that -- that's how management and external auditors and [GAAP] is
> stated to say that you should report and record your revenue and deductions if they
> are known and report separately for your SEC financials.

ECF No. 141-14 at pp. 73-74.

Plaintiffs argue the netback or wellhead price is never paid because it is merely an account receivable on a general accounting ledger showing a debt owed by CEMLLC to CELLC. According to Plaintiffs, the royalties must be paid on revenue actually realized on a marketed product. It cannot be a debt. In other words, it cannot be money owed. And the only revenue realized is the real cash paid by the third-party buyers to CEMLLC. CEMLLC pays COLLC for the oil, gas, and NGLs purchased at the wellhead. COLLC receives these payments on behalf of CELLC as part of the agency and management agreements it entered into with CELLC. Stipulation of Fact No. 29 (ECF No. 145 at PageID #: 11221).

(4:15CV2591)

Plaintiffs cite the holding in *State ex rel. Hamlin v. Collins*, 9 Ohio St.3d 117 (1984),[5] that an account receivable is not money "paid," but money "owed" and not "paid." *Id.* at 121. Plaintiffs contend CELLC does not "realize" the net by creating an account receivable for the net because it has already realized the gross and, under Ohio law, a receivable is revenue that is owed and not yet "received" or "paid." In oil and gas law, "the phrase 'amount realized' is commonly viewed as synonymous with proceeds." 8 Patrick H. Martin & Bruce M. Kramer, Williams & Meyers, Oil and Gas Law, Manual of Oil & Gas Terms at "A" (LexisNexis Matthew Bender 2016). "Proceeds" is defined as "the money obtained by an actual sale." *Id.* at "P." Thus, for revenue to be "realized" there must be "money obtained in an actual sale." Memorandum in Support (ECF No. 142) at PageID #: 11168.

Plaintiffs also argue that the downstream price must be used because the Class Leases require that the royalties be paid on products that are "marketed," and there is no marketing in the transaction at the well. According to Plaintiffs, the only marketing occurs in the sale by CEMLLC to the third-party buyers. *See* Transaction Confirmation (ECF No. 141-9). The Transaction Confirmation defines the "CELLC Production" being sold to CEMLLC to include not only "all Gas and associated liquids," but also the "marketing obligations for royalty owners." ECF No. 141-9 at PageID #: 10927.

---

[5] A case interpreting Ohio Revised Code §145.01, which governs the public employees retirement system. It does not involve oil and gas law.

(4:15CV2591)

Finally, Plaintiffs argue costs can not be deducted from the price paid by the third-party buyers. *See Pollock v. Energy Corp. of America*, No. 10-1553, 2015 WL 3795659 (W.D. Pa. June 18, 2015), *aff'd*, 665 Fed. Appx. 212 (3rd Cir. 2016). In *Pollock*, the defendant oil and gas producer, Energy Corporation of America ("ECA"), transferred title to the oil and gas to a marketing affiliate, Eastern Marketing Corporation ("EMCO"), and EMCO sold the oil and gas to unaffiliated third-party purchasers. The plaintiff class argued that marketing charges and interstate transportation charges could not be deducted from the royalties because they were incurred by EMCO, not ECA, and were incurred after it had transferred title to EMCO. Following a jury verdict for the plaintiff class, ECA filed a post-trial motion for judgment as a matter of law on the ground that there was insufficient evidence to support the verdict. In denying the motion, the court held that costs must be incurred by the lessee while the lessee still holds title. *Id.* at *5.

Defendant's motion presents the issue of whether CELLC paid royalties consistent with the Class Leases. The Court concludes that it did. Defendant paid "one-eighth of the net proceeds realized." The lease language is plain and unambiguous and the evidentiary record is clear: CELLC (the Lessee) paid Plaintiffs 1/8th of the proceeds it received from the sale of the oil and gas produced and marketed from the leaseholds. ECF No. 141-14 at p. 62. CELLC sells the oil and gas at the wellhead to CEMLLC pursuant to Ohio Rev. Code § 1302.01(A)(11),[6]

---

[6] The sale is pursuant to a Transaction Confirmation. *See, e.g.*, ECF No. 141-9 at PageID #: 10926 ("CELLC shall sell to CEMI, and CEMI shall purchase, all CELLC Production"). "The price can be made payable in money or otherwise." Ohio Rev. Code § 1302.17(A).

14

(4:15CV2591)

receives a netback price from CEMLLC for those sales,[7] and paid Plaintiffs 1/8th of those proceeds, without taking any deductions from the proceeds realized from CEMLLC. That is exactly what the parties negotiated for in section 5(B) of the Class Leases.

Plaintiffs do not dispute CELLC's lease interpretation. Instead, Plaintiffs argue that there are facts in dispute and improperly seek to have the Court interpret the Class Leases to mean Plaintiffs receive proceeds from the sale by CEMLLC to third-party purchasers downstream from the leasehold, rather than the proceeds the Lessee, CELLC, received from the sale of the oil and gas at the leasehold. But, there are no genuine, material facts in dispute. CELCC marketed,[8] sold, and transferred title to the oil and gas to CEMLLC at or near the wellhead; it received proceeds from CEMLLC based on a netback price; and it did not take any deductions from the proceeds it received from the sale to CEMLLC. CELLC is paid only the netback price from CEMLLC, not the third-party price.

Defendant correctly notes that Plaintiffs' factual and legal arguments have been rejected at the summary judgment stage by an Ohio trial court and by two arbitration panels. In

---

[7] The netback price is what CEMLLC sells the oil and gas for, less the expenses it incurs. See ECF No. 141-9 at PageID #: 10926 ("97% of the applicable CEMI weighted average sales prices (WASP) for each Delivery Point, minus Seller's proportionate share of any applicable fees incurred by CEMI in marketing such production, including, but not limited to, fees for compression, fuel and gas lost-and-unaccounted-for, dehydration, gathering, transportation, treating and processing."); Stipulation of Fact No. 15 (ECF No. 145 at PageID #: 11219).

[8] Market is "to expose for sale in a market" or to "sell." Merriam-Webster Dictionary.

15

(4:15CV2591)

*Gateway Royalty, L.L.C. v. Chesapeake Exploration, L.L.C.*, No. 2017CVH28970 (Ohio Ct. Com. Pl. Carroll Cty. July 15, 2019),[9] the state court granted defendants' motion for summary judgment in a case with similar facts to the case at bar. It construed Ohio contracts under Ohio law and concluded CELLC's method of calculating royalties, under substantially similar lease language, was proper and Gateway Royalty's argument that material facts were in dispute was rejected. *See* ECF No. 172-1. The court found that "[Gateway Royalty] is paid royalties based upon the price that CELLC receives in its sale of the gas to CEMLLC." ECF No. 172-1 at PageID #: 12552. The court further found that "[t]he costs incurred for post production are incurred by CEMLLC and are not deducted by CELLC from the price paid by CEMLLC, but rather [Gateway Royalty] is paid based on the price paid at the wellhead, a price that reflects costs incurred to bring the gas downstream; the netback method." ECF No. 172-1 at PageID #: 12552. That decision, however, has been appealed to the Seventh District Court of Appeals of Ohio. *See* ECF No. 172-2. Gateway Royalty has filed a brief in the state appellate court. *See* ECF No. 174-1. In the *Hale* (ECF No. 1-2 in Case No. 4:18CV2217)[10] and *Ostroski* (ECF No. 123-6)[11] AAA arbitration decisions, arguments that were similar to those made in the case at bar by Plaintiffs were rejected by the respective arbitrators.

---

[9] Gateway Royalty's attorneys are Robert C. Sanders and James A. Lowe, who are also counsel for Plaintiffs in the case at bar.

[10] *Hale v. Chesapeake Expl., L.L.C.*, AAA No. 01-17-0000-6233 (AAA June 28, 2018), *aff'd*, No. 4:18CV2217, 2019 WL 1863670 (N.D. Ohio April 25, 2019) (Pearson, J.).

[11] *Ostroski v. Chesapeake Appalachia, L.L.C.*, AAA No. 14-20-1400-0183 (AAA May 1, 2018) (under Pennsylvania law), appeal pending.

(4:15CV2591)

## V. Conclusion

Plaintiffs' Motion for Leave to File Clarification of Answer at Hearing (ECF No. 177) is granted.

Viewing all facts and reasonable inferences in the light most favorable to the nonmoving party, Defendant's Motion for Summary Judgment (ECF No. 146) is granted and Plaintiffs' Motion for Summary Judgment (ECF No. 141) is denied.

Final judgment will be entered in favor of Defendant and against the Class on the Second Amended Class Action Complaint (ECF No. 18).

IT IS SO ORDERED.

  September 30, 2019            */s/ Benita Y. Pearson*
Date                                    Benita Y. Pearson
                                          United States District Judge